UNITED STATES *v.* PROCTER & GAMBLE MFG. Co. (No. 4544)[1]

[1] C. A. D. 345.

United States Court of Customs and Patent Appeals, November 4, 1946

*Paul P. Rao*, Assistant Attorney General (*Joseph F. Donohue*, special attorney, of counsel), for the United States.

*B. A. Levett* (*Meyer Ohlbaum* of counsel) for appellee.

[Oral argument October 3, 1946, by Mr. Donohue and Mr. Levett]

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges

GARRETT, Presiding Judge, delivered the opinion of the court:

The Government has here appealed from the judgment of the United States Customs Court, First Division (C. D. 981), sustaining importer's protest and awarding it recovery of duties assessed and collected upon merchandise invoiced and entered at the port of New York as citronella oil.

It was imported from Ceylon, of which country it was a product, and was contained in 32 drums, 16 of which were designated as lot 137 and 16 as lot 138, the drums being numbered 1 to 16 in each lot. A sample from each of the 32 drums was analyzed by the Government's chemist who reported that an amount of petroleum distillate (kerosene) was contained in the oil in each drum. The lowest quantity of such petroleum distillate in any one drum was 6 per centum; the highest 13.6 per centum. The average percentage in the shipment considered as a whole was 8.78 per centum.

The collector (after correspondence with and under the instructions of the Commissioner of Customs) classified the merchandise under paragraph 60 of the Tariff Act of 1930, assessing duty at 30 per centum ad valorem and 40 cents per pound, that being the rate fixed in the trade agreement with the Republic of France, T. D. 48316 (69 Treas. Dec. 853, 863), this being a modification of the rate of 50 per centum ad valorem plus 40 cents per pound, provided in the paragraph as originally enacted by Congress for those "Perfume materials" consisting of "all mixtures or combinations containing essential or distilled oils, or natural or synthetic odoriferous or aromatic substances * * * and not containing more than 10 per centum of alcohol." Specifically, the claim of the Government is that the merchandise falls within the provision for "mixtures or combinations containing essential or distilled oils." Importer's protest, as originally filed, read in part as follows:

We claim that the goods in question are properly nondutiable under the Act of June 17, 1930.

Under Par. 1673, 1731, or 1733, or under Par. 1731 and 1733 considered together. We further claim that if not free of duty then such merchandise is dutiable at 25% ad valorem under Par. 58.

The foregoing claims are made directly, or by virtue of paragraph 1559. It is further claimed that the goods are dutiable under paragraph 1558 at 10 percent ad valorem, or if not, at 20 percent ad valorem.

Subsequently, an amendment was granted adding to the protest an alternative claim under paragraph 57 of the act.

Notwithstanding the several paragraphs under which claim was made, the trial court only passed upon that under paragraph 1731, which we quote in full:

PAR. 1731. Oils, distilled or essential: Anise, bergamot, bitter almond, camphor, caraway, cassia, cinnamon, citronella, geranium, lavender, lemon-grass, lime, lignaloe or bois de rose, neroli or orange flower, origanum, palmarosa, pettigrain, rose or otto of roses, rosemary, spike lavender, thyme, and ylang ylang or cananga: *Provided*, That no article mixed or compounded with or containing alcohol shall be exempted from duty under this paragraph.

The brief for appellee states, in substance, that its claim under the quoted paragraph is its principal claim, but also presents arguments as to other claims which the trial court did not find it necessary to pass upon. However, neither paragraph 57 nor paragraph 58 is discussed and we assume the claims under them to have been abandoned.

With respect to paragraph 1731, *supra*, it is, and has been throughout, the position of counsel for the Government, as expressed in their brief before us, that the paragraph—

provided for the essential or distilled oils which it named in their natural state: that the merchandise in controversy, admittedly a mixture of citronella oil and petroleum distillate, was not described by the language of paragraph 1731 and that no commercial designation different from the common meaning justified an interpretation of paragraph 1731 which would include such merchandise.

Also, it was and is the position of Government counsel—

that the merchandise was a mixture containing a distilled oil and was therefore described and provided for in paragraph 60.

So, the Government brief asserts:

Thus the question at issue is whether the provision in paragraph 1731 for "citronella oil" can be construed either according to a common or commercial understanding to include the imported merchandise.

The contention on behalf of appellee is stated in its brief as follows:

Various claims are made in the protest, the principal claim being for free entry under the *eo nomine* unqualified provision for Citronella Oil in Par. 1731. In other words plaintiff's main claim is that in spite of the fact that the Citronella Oil concededly contains a percentage of petroleum distillate, as the government chemist reports, nevertheless the article is still commercial Citronella Oil, although adulterated, and therefore free of duty as such under the long established rule that the designation of an article *eo nomine* includes that article in all its forms; that therefore even if the article fall within the provisions of Par. 60 under which it was assessed, it is more specifically provided for under this *eo nomine* provision.

In the succeeding paragraph counsel for appellee makes the further claim that the merchandise "can in no way be lawfully assessed" under paragraph 60, and that if not classifiable under paragraph 1731, it falls within paragraph 1558.

Upon the record presented it is logical that we first consider and rule upon the holding of the trial court that the merchandise is classifiable under paragraph 1731, *supra*, from the reading of which it is observable that citronella oil is therein provided for *eo nomine*.

That a pure, unadulterated citronella oil is classifiable under the paragraph is not questioned, but it is the contention of counsel for the Government, in effect, that the addition of 6 per centum to 13.6 per centum of petroleum distillate, which admittedly was injected in Ceylon and became mixed with the citronella oil (thus creating what is shown to be a physical mixture), so changed the properties or character of the substance that as imported it was, for customs purposes, a substance not falling within the common meaning of the term "citronella oil."

Also, it is claimed that "Mixtures of citronella oil and petroleum distillate, the latter varying in amounts from 6% to 13.6%, were not, on or prior to June 1930, commercially designated as 'citronella oil'," and that appellee failed to establish any commercial designation of citronella oil which would include the imported product.

The contentions of counsel for appellee on this phase of the controversy are epitomized in his brief in four "Points" as follows:

### POINT I

The Record establishes without dispute that Congress had in mind adulterated Citronella Oil as well as the pure product when it provided for the free entry of Citronella Oil.

### POINT II

Citronella Oil adulterated with petroleum distillate has for many years always been known commonly and in trade and commerce as Citronella Oil.

### POINT III

The imported product, although adulterated retained all the properties of pure Citronella Oil, and was used in the same manner and for the same purposes as pure Citronella Oil.

### POINT IV

The *eo nomine* provision for Citronella Oil includes Citronella Oil adulterated with petroleum distillate.

Both parties took testimony and certain documentary and physical exhibits, including samples taken from each drum, were placed in evidence.

Before proceeding to a discussion of the evidence we deem it pertinent to recite certain matters concerning which there is no dispute.

Chemically, citronella oil is classed as an essential oil. Webster's New International Dictionary defines an essential oil as "any of a class of volatile odoriferous oils found in plants and imparting to the plants odor and often other characteristic properties." It is not questioned that all the citronella oil contained in the imported substance was derived from plants. In other words, it was not either wholly or partly a synthetic product, such as the origanum oil involved in the case of *United States* v. *P. R. Dreyer, Inc.*, 28 C. C. P. A. (Customs) 325, C. A. D. 162, was held by the majority of this court to be.

Petroleum distillate (kerosene), of course, is classed as a mineral oil.

We have examined the discussions of citronella oil in various standard chemistry publications. One of the most elaborate statements concerning it was found in volume IV, page 638, of the Revised and Enlarged edition of Thorpe's Dictionary of Applied Chemistry, published in 1928, reading as follows:

Citronella oil is distilled from the fresh grass *Andropogon Nardus* (Linn.), (*Cymbopogon Nardus* [Rendle]) (N. O. Gramineae), which is largely grown in Ceylon and in the Straits Settlements. The yield is from 0.5 to 1.0 p. c.; the Ceylon oil has sp. gr. 0.900–0.915; rotation 0° to −21°; refractive index 1.470–1.482: the Java oil has sp. gr. 0.885–0.910; rotation 0° to −10°; refractive index 1.465–1.468. Citronella oil contains geraniol, citronellal, camphene, dipentene, limonene, and traces of linalool, borneol, methyl heptenone, methyl engenol, and sequiterpenes. It is largely used in cheap soap perfumery. The Ceylon oil contains a large proportion of geraniol, the total acetylisable constituents amounting to 58–65 p. c. In the Java variety the citronellal predominates and the proportion of acetylisable constituents is higher (75–95 p. c.) since citronellal is converted into *iso*pulegol acetate on acetylation. There are at least two varieties of citronella grass cultivated: (1) the 'Lena batu' type; (2) the 'Mahi Penghiri' type. The Ceylon oil is largely adulterated with Russian petroleum, the proportion of 12½–15 p. c. having passed the solubility test which has been long in vogue. Attempts are being made to establish a standard for the sale of the Ceylon oil on geraniol content in the same way as cassia and other essential oils are sold on their percentage of odorous constituents.

The trial court cited the fourth edition of Thorpe's work published in 1939 in which it was said (relative to citronella oil): "Such oils may contain 10 to 15 percent of petroleum."

Other chemical publications are cited in the trial court's decision with quotations therefrom as follows:

Allen's Commercial Organic Analysis, volume IV, published in 1911, states (p. 306):

Citronella oil is * * * frequently adulterated. Petroleum (kerosene) is much employed, and fixed oils are sometimes added.

The following appears in The Volatile Oils, by Gildemeister and Hoffman, second edition, volume II, published in 1916, under the heading "Ceylon citronella oil" (p. 234):

In the case of citronella oil, petroleum has been a favorite adulterant.

Ernest J. Parry states, in the Chemistry of Essential Oils and Artificial Perfumes, fourth edition (1921), volume I (p. 64), that Ceylon citronella oil is "almost universally adulterated," and further (p. 65):

The trade in citronella oil is in a very unsatisfactory condition, as practically all the oil exported from Ceylon is, by consent, adulterated the amount of pure oil sold being almost negligible.

In Parry's Cyclopaedia of Perfumery, published by J. & A. Churchill (London, 1925), the following appears (vol. 1, p. 146):

\* \* \* Practically all the Ceylon citronella oil that is dealt in commercially is adulterated with a small quantity of kerosene, although a pure grade is obtainable under the description of 'Estate Oil'.

At page 49 various tables are set forth giving the specific gravity, rotation, and refractive index of various citronella oils, listed as "Pure Citronella Oils," "Citronella Oils Mixed with Adulterants," and "Adulterated Citronella Oils on the Market."

While the Tariff Act of 1922 was in process of formulation the Ways and Means Committee of the House of Representatives was supplied with a series of Tariff Information Surveys, prepared by the United States Tariff Commission, covering all the commodities provided for in the 1913 tariff act and some in addition. Pamphlet A–12 of the series was devoted to essential and distilled oils. It was cited in the decision of the trial court. From it we quote the following which appears on page 33 of the pamphlet:

\* \* \* Citronella oil is distilled from Indian or citronella grass, which is known botanically as *Andropogon nardus*. There are two principal varieties of this grass, the most important of which is the *Lana batu*, grown in Ceylon and India. In Java citronella oil is distilled from "winter grass," which is the *Maha pangiri* variety. Citronella oil is a pale yellow or brownish oil possessing a powerful but pleasant odor. The latter property, along with its low price, accounts for its use in cheap perfumery, especially in soap manufacture. Javan oil is of considerably higher value than the Ceylon oil, and has a different and much finer odor. The inferior quality of the Ceylon oil is due to some extent at least to the consistent practice of adulteration. Prior to the last few years, pure Ceylon citronella oil was seldom sold. The principal adulterants are petroleum, fatty oils, and benzine or motor spirits.

Efforts made to force the producers in Ceylon to eliminate adulteration with petroleum resulted in the use of a solubility test known as the Schimmel test, which is based on the fact that the pure oil is soluble in 10 volumes of 80 per cent alcohol. It has recently been claimed that this test is not a satisfactory index of all forms of adulteration and in its stead there has been proposed a test based on the ester content. Most of the commercial oil from Ceylon contains about 55 per cent of the total *geraniol* esters (that is, *geraniol* plus *citronellol*).

It was further stated that lemon-grass and citronella oil are "closely related."

Incidentally, it may be said that the survey states (p. 36):

The free list of the act of 1883 contained a specific provision for "citronella, or lemon-grass oil," and a like provision appeared in the free list of the acts of 1890,

1894, 1897, and 1909. In the act of 1913 these oils became dutiable at 20 per cent ad valorem, and the provision (par. 46) was changed to read: "Oils, distilled and essential: * * * citronella *and* lemon-grass."

In the bill, H. R. 7456 (which culminated in the Tariff Act of 1922), as it passed the House of Representatives on July 21, 1921, the paragraph which, with some alteration, eventually became paragraph 1731 was numbered 1625. At the request of the Senate Committee on Finance, while the bill was pending before it, the Tariff Commission prepared and submitted a comparison of the House bill, paragraph by paragraph, so far as practicable, with the 1909 and 1913 tariff acts which was published in a volume, entitled Summary of Tariff Information 1921. At page 1389 of the volume attention is directed to Tariff Survey A–12, *supra*, and the statement is made:

* * * Citronella oil is distilled from "Indian grass," chiefly in the southern part of Ceylon. It is a pale-yellow oil which possesses a powerful odor, and this property, along with its low price, accounts for its extensive use as a cheap soap perfume. It is also used as a protection against insects, chiefly mosquitoes.

The Summary of Tariff Information 1929, volume 2, page 2478, prepared by the United States Tariff Commission for use in formulating the Tariff Act of 1930, states:

* * * Citronella oil is a pale-yellow oil distilled from citronella grass. It possesses a powerful odor, and this property, along with its low price, accounts for its extensive use as a cheap soap perfume. It is also used as a protection against insects, chiefly mosquitoes. Citronella Java oil is a source of geraniol.

As has been indicated, the Government insists that citronella oil to which was added before importation from 6 to 13.6 per centum of petroleum distillate is not within the common meaning of the term citronella, and, argues, therefore, that it was incumbent upon the importer in order to prevail to establish a commercial designation different from the common meaning which would cover such a "mixture." This thought was set forth in the brief for the Government (which, of course, was filed before that for appellee) wherein Government counsel emphasized the fact that they had not found anywhere in the record "a declaration by counsel for appellee that the testimony of his trade witnesses was offered to establish that there was a commercial designation for the term 'citronella oil' which embraced such oil when mixed with petroleum distillate in quantities varying from 6 to 13.6 per centum."

The Government brief, however, discusses and analyzes the testimony of appellee's "trade" witnesses with considerable minuteness in support of its contention that their testimony fails to establish commercial designation.

In the proceedings before us no statement has been made by counsel for appellee which we construe as a declaration that commercial designation as distinguished from common meaning is relied upon,

but we note that the trial court made a finding which, whether so intended or not, is capable of being construed as a holding that a commercial designation different from common meaning was established. After referring to certain of the testimony the court said:

> We are of opinion that the testimony adduced by plaintiff in the present record has fairly established that the imported merchandise in the condition in which imported, containing this added petroleum distillate, was generally and uniformly known in the trade and commerce of the United States, and was bought and sold and used as citronella oil, and that this condition existed at and prior to the passage of the Tariff Act of 1930.

In a subsequent part of its opinion, however, following the quotation from the literature hereinbefore set out, the court said:

> We are of opinion that the Congress, having the information before it that citronella oil from Ceylon usually contained, and was expected to contain, adulterants such as petroleum, intended the provision in paragraph 1731 to cover such citronella oil.

This would seem to be, at least in part, a reliance upon legislative history to establish common meaning.

As we understand the position of counsel for appellee he does not claim to have established that there is a commercial designation of the term citronella oil which differs from its common meaning. His contention is that the merchandise here involved falls within the common meaning of the term, in the light of the literature upon the subject and in the light of testimony introduced to the effect that those engaged in using, or in buying and selling, citronella oil have long known that oil imported from Ceylon frequently, if not always, contained some petroleum distillate; that nevertheless importations containing it have been uniformly dealt in as citronella oil; and that it has been used just as citronella oil is used, its use not being affected by the distillate. We have examined the testimonial record (consisting of testimony of chemists and a number of what are called "trade witnesses") with care and we are confident that the evidence is not sufficient to establish a commercial meaning of the term different from the common meaning, but we do not agree with counsel for the Government that it was incumbent upon the importer, in order to prevail, to establish commercial designation. If the material falls within the common meaning of citronella oil, of course, that is the end of the controversy, and it is our view that if it may be reasonably concluded from the available information competent to be considered that Congress did not intend to exclude substances such as that here involved from the operation of paragraph 1731, the judgment of the trial court should be affirmed.

The literature from which we have quoted, *supra,* and the testimony in the case indicates that the principal use of the citronella oil which

is imported from Ceylon is by soap manufacturers. As we understand the testimony of two of the chemists (Martin and Egan), who are on the chemical staff of importer, its use by importer is solely in the making of certain brands of soap, particularly kitchen and laundry soap. It is not desired that such soaps have a perfume which will be imparted to dishes or laundered articles, and, strictly speaking, the oil is used not as a perfumery but for neutralizing the offensive odor incident to the grease, etc., used in the body of the soap, and because of its powerful odor only a very small quantity of oil (some two-tenths of a per centum) is required. According to those witnesses the merchandise here involved was used in the same quantity as pure citronella oil, the formula not being departed from.

It appears that the trade recognizes two grades or qualities of Ceylon citronella oil, one referred to as "Estate oil" and another as "F. A. Q." meaning "Fair Average Quality." The latter is also referred to, according to certain of the testimony as "Schimmel test oil." Appellee's witness, Herman J. Kohl, president of a corporation which deals in essential oils, including citronella oil, stated:

The estate oil is an oil which as a rule carries a minimum of 57 percent geraniol. The Schimmel test oil is an oil which as a rule carries between 50 and 52 percent geraniol.

The witness stated, in effect, that his company did not "test for the petroleum distillates."

There does not seem to be any clear-cut description of the Schimmel test in the record, but it is one which apparently is well understood in the citronella trade, as is shown by the testimony of the witnesses in this case, and, as may be seen from the quotations, *supra*, it is frequently referred to in the literature. It seems to have been evolved many years ago by a German scientist for the purpose of detecting whether any petroleum distillate is present in citronella oil.

It appears to be a test commonly used by those buying and selling citronella oil, and it was used by the Government chemist in testing the involved importation. He also used another test which, as we understand his testimony, he regarded as superior to the Schimmel test.

Estate oil seems to be that which is distilled on large estates in Ceylon and is of a better quality than the "F. A. Q." produced by small distillers. However, there is testimony to the effect that users expect both grades to contain some petroleum distillate.

The tariff act makes no distinction between different grades of citronella oil, nor does it make any distinction between the products of different countries. It is made duty free regardless of its source and of its grade or quality. Admittedly, one of its most important elements is geraniol, but the geraniol content does not affect its

dutiable status. The presence of the petroleum distillate in the merchandise at bar did not affect its use for the purpose for which it was purchased. It diluted or adulterated the citronella oil, but not to an extent which affected its use in making soap. No benefit resulted to the importer from the adulteration, and such evidence as there is in the record is to the effect that importers do not wish it adulterated and take it only because they must do so to meet their requirements in industry.

It is clear, of course, that sustaining the Government's position here would create an anomalous situation in citronella oil commerce—one which it is difficult to believe the Congress intended. The pure oil would be free but the diluted or adulterated product used for precisely the same purpose would be subjected to an extraordinarily heavy duty.

Citronella oil is not competitive with any thing produced in the United States, but is valuable for use in important domestic industries, and ultimately to consumers. It is imported in large quantities as shown by the Summary of Tariff Information before us. It is readily understandable why Congress having no domestic citronella oil industry to protect was willing to forego the revenue which might have been collected upon it in order to favor those domestic industries which use it.

If the addition of petroleum distillate to citronella oil were shown to result in a product having a use different from the pure product, or, to be more exact, if it destroyed it as citronella oil and fitted it for only a perfume material a different situation would confront us, but, of course, no such result is shown nor do we apprehend that it could be.

Upon full consideration it is our view that the Customs Court reached the correct conclusion and the judgment is *affirmed*.